The case this morning is Insulet Corporation v. Eoflow, Co. Ltd., 2024, 1137. Mr. Gershenson. Good morning, Audience. Adam Gershenson for the Appellant. We're here today to address a district court ruling that cites almost nothing while imposing the most drastic version of an extraordinary remedy. Can I just interrupt you before you get involved in your argument to just update us on the status of this case? I thought that might be necessary, Your Honor, of course. So the 20HA letters indicated that the parties moved to modify the injunction. It's also moved for contempt, which was rejected. The new and operative order maintains all the problems of the old order, so it's not moved or anything like that. But it does make the situation much more dire and time-sensitive for Eoflow, and that's because it carves out or eliminates the carve-outs. There used to be the ability to – I didn't want to – but I just want to know what's going on with the case itself. Oh, my apologies. Trial in November is what's going on. We have, in summary judgment, September slash October, the briefing for that. And both parties, nobody argued whether or not the district court had any – there was a jurisdictional question with respect to the district court modifying the order while the appeal was pending here? Neither party addressed that issue, Your Honor. Why didn't you move for a stay of the injunction at the outset? So we asked for a stay at a hearing, and the court said out of hand, I'm not doing that. So that was one piece of it. And then it's substantially gotten worse, as I noted, with the modification. So the urgency is much greater now, and I would request, if the court is leaning – No, but did you move to stay the initial injunction? We moved verbally. We did not move in writing. We were told, I'm not – word for word, I'm not staying this case. And you only moved in the district court, not the front office? That is accurate, Your Honor. Correct. If I may? Please, sorry. The district court's vague, unsupported ruling contradicts Supreme Court precedent, the federal rules, and the Defend Trade Secrets Act. And there are real consequences, and there are three primary legal errors I'd like to address today. First, on the likelihood of success, the district court erred by not even determining whether the claim was timely, number one, and number two, not even analyzing or refusing to analyze the, quote, number or contours, which is to say the boundaries of the trade secrets that were asserted. Second, on irreparable harm, the district court's order was wrong when made the first time, and the second order is doubly wrong, because the sole basis for irreparable harm in the first place, the Medtronic acquisition, which was then pending, is gone. Terminated, canceled. So when did that happen? Was that after the district court issued the preliminary injunction, then circumstances changed? So did you go in and move for changed circumstances based on irreparable harm? We argued in the recent modification that this was off the table, but the harm to EOFLO was increasing, the harm to Insulet was gone, and the district court paid it no mind. The district court said, for example, let the chips fall where they may. I'm disinclined to give any weight to the financial impact to EOFLO. That was the response we got on that issue, Your Honor. Where is it in the record that the Medtronic deal is off? And just to follow up on Judge Prost, did that happen after the first preliminary injunction was entered? It is in the papers at A9942. 9942. Yes. And perhaps the following page, 43, as well. The report is that the deal, quote, fell through, was called off, and was terminated. And, yes, that was after the injunction. So I can ask you a question. So at the time the district court found irreparable harm, the Medtronic deal was a fair consideration because it was still alive. So at the time, the transaction was still alive. It was not legally a reasonable or proper consideration for a number of reasons, including the alleged price erosion, no proof whatsoever that the products had been in the market together. Anything that would have come in this two-player market from Medtronic lost sales would have been far off. But just on a factual point, did you not have an obligation to go back to the district court if it found the Medtronic deal was a basis for irreparable harm, rejecting your legal arguments to the contrary, and now the Medtronic deal disappears? If you want to get out from under the order, don't you have an obligation to go back to the district court and say, by the way, the factual basis is no longer there? And in the modification, we did just that. We argued repeatedly. Okay, but not until this very recent amended order that we now have. Correct. Speaking of the amended order, if we were to reverse the preliminary injunction that's on appeal here, what happens to the second amended preliminary injunction? Well, so the district court specifically said, I'm going to hold that in abeyance until June 1st because I may well be wrong and the Federal Circuit can correct me. And so that is the opportunity that we have here, to right that wrong. But, I mean, I guess we don't have time clocks, and we don't have orders that we have to do something by June 1st or whatever. So what if nothing happens by June 1st? Is that in effect then? So even if on June 2nd we were to reverse the original preliminary injunction, you have to now go back and appeal the second injunction? We would certainly hope not. We would ask that if you were leaning toward anything, that you would at a minimum, we understand how busy you are, so we're not pushing for a full ruling before June 1st, but even a line that says we stay the most draconian parts of this, that would be useful. And meaningful. So wait, but if we were to, before June 1st, all that's before us is the original preliminary injunction. So if we stay that before June 1st, does that take care of the second amended preliminary injunction? My understanding is that's how the district court is viewing it, yes. Right or wrong, the district court would obey any order, certainly from this Court, regarding either of these injunctions. Well, again, do you know another circumstance where we've got an appeal of a particular preliminary injunction and then the district court proceeds to change the injunction and puts a time frame on it that doesn't go into effect until a few weeks after we've heard it? I've just not seen a situation like this before. I have not seen that situation either. There are many decisions that the district court made that we find unprecedented and we don't agree with. That would be one of them, Your Honor. Well, I mean, I'm not laying it necessarily entirely on the district court because I don't know what went down, as I said. First question is, did he have the authority of the jurisdiction to do an amended injunction while this is pending? Neither of the parties apparently urged him not to do that or raised that question. So I don't want anything I'm saying to suggest that this was all on the district court. Sure. We could have refused. We could have done any number of things. I think what we're trying to do is just practically we have to address the order that's before this court, which agreed is the first one. The modification only makes it worse. The major problems with the order, though. Is the modification just a nullity with the jurisdiction that passed here? We would welcome that ruling, Your Honor, yes. That would simplify the issue as well. What about on the specificity of the lack of specificity of the trade secrets outlined? I get what you're saying about what's in paragraph 3, paragraph 3 and 4, but 5 seems to have greater specificity in terms of the misappropriation of trade secrets. So are we free to say, okay, some of this stuff is way too broad, but some of it is specific enough so that we could hold the injunction with respect to that? As I understand it, agreed on 3 and 4 with any and all information that's ever been taken by anyone. Agreed. That is too vague, and the injunction goes far beyond any identified trade secrets. For the next piece, you're talking about where it says design and those types of things. Those are categories. Those are not trade secrets. And so what the law says is you've got to identify the trade secrets, and the injunction can't go beyond the specifically identified trade secrets. That is crystal clear in this Court's Nutrition 21, the Carl Zeiss decision. Well, what about 5.4, paragraph item 5F? I'm sorry. That seems to be specific, and it describes specifications for device software, including but not limited to the occlusion detection algorithm. Now, that seems specific enough. I think you made an argument to the district court that said you said, well, this is all public anyway. Correct. And he rejected that. And that's a kind of hotly different standard of review. So here the problem is not specificity. It's whether or not these were trade secrets. And isn't there a lot of deference that we should give the district court in terms of his conclusions there at this preliminary stage? So specifically to that point, Mr. Sherman, our expert, did demonstrate that all of these were generally known, readily ascertainable. That evidence the district court never even referenced whatsoever. And so that does create conflicting evidence, which under the First Circuit case law, including McDonough and Spencer, says if there's conflicting evidence like that, an unresolved factual issue is an injunction cannot issue. In terms of specifically, you're looking at 5D. I see bills of materials. 5F. Specifications for device software. Right. So the occlusion detection algorithm, for one, was generally known. For another point, there's been no exchange of the software, of the code. So there's no indication that this was used in any meaningful way. It has been disclosed in our investor presentations that they said in their briefing to you that they saw. But there's been no code review. So the idea of this device software doesn't really add up. And the others, as I said, are all really categories. They are not the documents. They are not the trade secrets themselves. And so what the court, it's really not defensible to say all of this is trade secret. And so what the district court says, well, it falls within the statutory definition of the Defend Trade Secrets Act, these types of materials. But that's like saying my patent is valid because it falls within 101. There are additional requirements for each trade secret. And that includes that it's not readily ascertainable, that it's not generally known. Well, I understood that you were saying this is all available in the public. And I couldn't find whether the district court made any findings as to whether or not you were right or wrong in that regard. Agreed. The district court, well, that's where I started on the citation problem, both on the law and the facts. There's no tying of any decision. That's the fundamental problem. Who can tell from this what was trade secret, number one, and what was taken, number two? And those are essential. They've enjoined this company. Okay. I'm sorry to cut you off. Please. But your time is up. Your clock is running. So I wanted to go back to one of the issues you started with, which was the statute of limitations and the district court's clear statement that he wasn't going to reach the statute of limitations. However, he did talk about the delay issue with respect to the timing of the preliminary injunction. And he made arguably some findings with regard to that. Couldn't we use those findings in terms of aligning the question of statutory limitations? Well, a few things. One, in a preliminary injunction, you can't actually affirm on grounds not addressed by the lower court. That's unlike many other scenarios. But two, those are two different analyses involving different time periods. And so Inslet says, no, he did roughly analyze it, as you said, the substitute analysis for irreparable harm. But what he said was, could Inslet have brought a preliminary injunction claim at that time? Now, that is absolutely the wrong legal question if this was an analysis of statutory limitations. And the First Circuit has said so in the Epstein v. C.R. Bard case. That's not what inquiry notice is about. And that's what Epstein said. That's a fundamental misapprehension. Counsel, you're well into your rebuttal time. Do you want to save it or continue? I will just say the district court expressed no opinion on statutory limitations.  And I'll come back to the topic. Thank you. Mr. Jay. Good morning, Your Honors. May it please the Court. We begin just with the jurisdictional point, because I know the Court was interested in that. As we understand it, this Court has jurisdiction over the appeal, the P.I. appeal. The district court could not completely dissolve the P.I., but the district court, as with any preliminary injunction, could dissolve the P.I. jurisdiction to modify the injunction and supervise compliance with it. That's what makes a P.I. appeal different for jurisdictional purposes. So if he can modify it while it's on appeal, what does that do to the appeal? Let's assume, I'm not suggesting that's in this case, but clearly the stuff that he modifies is at issue in this appeal. Do we then take it off the table, or what happens? I'm not sure that that's right, Your Honor, that the stuff that he modifies, like none of that is the thrust of the appeal. No, I'm suggesting hypothetically. Sure. So the case that I'll cite to you is A&M Records v. Napster, which is a Ninth Circuit case, which I think has the most thoughtful discussion of this, which is that basically you can't, the district court can't proceed to re-adjudicate the substantial rights that are on appeal. So, in other words, the district court could not change its mind on some fundamental aspect of the issues that are briefed before this Court. But preliminary injunctions are preliminary. They're subject to adjustment, and certainly the district court has to police compliance with them and address changed circumstances as they arise. Okay. So I think that's the job. If we're talking about what he could and couldn't do, why would he not have re-evaluated the irreparable harm based about the, based on the changed circumstances with regard to Medtronic? It's not clear. So let us start with the record before this Court. Okay, absolutely. Right, right, right. Because my friend on the other side cited you to two pages of the record. The second of those pages, 9943, this is a transcript of the, of an investor call with the CEO of EOFLOW. He says Medtronic continues to be interested in EOFLOW. So, in other words, it is not clear at all that circumstances have changed. I think the Court's questions did get at the point that that would be a matter for the district court to address. But the, we don't think that would be, that certainly is not a question before this Court. And nor do we think that was the question presented to the district court regarding modification. But if it were, then the other side is free to appeal the second order that was issued a few weeks ago. Counsel, the Court did not deal with the statute of limitations. Isn't that absolutely essential to dealing with likelihood of success? And isn't that a fatal defect? It's not. No, Your Honor. And the short answer is the Court made findings that establish that our claim is timely and the Court approached that issue, frankly, on grounds that are more favorable to the other side. Here's what I mean by that. The Court assessed whether we had promptly brought this action in looking at the irreparable harm prong and whether the equities lay with Medtronic, with Insolent or EOFLOW. I express no opinion about the approval of the statute of limitations. That's not at issue here. So the Court made findings about, factual findings about when the, when Insolent had a basis for suspecting trade secret misappropriation. Statute of limitations was at issue. The judge was wrong about that, correct? I think the judge recognized that there are two distinct issues and he was going to reach one of them. So the tests for them are distinct. But both issues were presented to him and he said I'm just not going to reach one of them. So I think the best explanation for that, Judge Stark, is that. But first he answered yes. He did not address statute of limitations. So he said what he said. But I think that about not addressing the accrual. Yeah, yeah. I agree that the quote is accurate. But I think if you look at the factual findings, you'll see that he's answering the same question on turf that is friendlier to the other side. What I mean by that is. Where does he ever answer the question whether your client was on inquiry notice in 2018 or 2019? I see where he says you didn't have enough to sue, you didn't have enough to move for a preliminary injunction 2018, 2019. But where does he ever analyze what is really the test, which is with the exercise of reasonable diligence starting in 2018 or 2019, would you not have had a claim within three years? Right. And the three-year period is crucial because when we're talking about limitations, all that matters are things that happened before August 3, 2020. Where he addresses that is on page 17 where he says in March 2021, which is after that critical date, there is no real reason for Insulet to have thought otherwise. That is bolstered by his specific findings about the 2018 trade show in which he says there's no evidence that there was a transparent device. He points out, and this I think really is the crucial point, that this device was not on the market until after the critical date had passed. So in other words, as the judge found, there's no basis for Insulet to have gone out and found a prototype. It's not even available on the market. The mere existence of the trade show display and an employee who left the company in 2010 having joined EOFLOW, that is not inquiry notice. So let me see if I understand what your argument is. You agree he did not reach the statute of limitations. He explicitly said he was not reaching the statute of limitations, which, as Judge Lurie pointed out, was the necessary predicate for this case, but that we should affirm a non-finding of statute of limitations not being breached because of other findings he made with respect to that matter. These findings are on an overlapping issue, and the district court went past the critical date and even made findings about things that happened closer to when suit was filed because he was approaching the same issue through the lens of the statute of limitations. I mean, does that raise some suspicion, at least, to a normal observer? I don't think so, Your Honor, not if you look at the findings that the Court made. The Court certainly found likelihood of success. This is all, of course, being done on an expedited basis after hasty discovery, and the Court understood, I think, that the jury is going to be the ultimate decision-maker about whether the other side can make its defense. Let me move to that now, which is likelihood of success and the merits. I mean, the breadth of some of the paragraphs here is really astounding, is it not? I mean, I tried to go back in the record and assess the evidence that was presented with respect to the breadth of the so-called trade secrets. I don't know if there were findings on what was a trade secret and what. I mean, I'm just at a loss with respect to the breadth of those findings. Let me bring up for the Court what I think is a very important distinction. The Court found in its oral decision that the eight categories of trade secrets that Insolette presented had been misappropriated, at least there was a likelihood that we would be able to show, that there was substantial, indeed, strong evidence that those categories of trade secrets had been misappropriated. That's not the same thing as what the Court wrote in its order, but that is because the order is a remedial order. It's prophylactic. It says Insolette is likely to prevail in establishing misappropriation of trade secrets. Here is what you may not do during this litigation in order to avoid further irreparable injury to Insolette. That means … So how do we evaluate that? Let's assume we accept your thing about the eight categories. To the extent that the order goes beyond that, you can say it's prophylactic, but what authority does the district court judge have to do on the likelihood of success on the merits beyond, again, assuming for the sake of this question that I agree with you about those eight categories being sufficient? So I think in the context of this litigation where it was clear that after just a few weeks of discovery and thousands of purloined documents having been found in the other side's possession, the district court was not prepared to say that these were the only eight categories of trade secrets that we would succeed by the time of trial in proving we're misappropriated. He, therefore, directed EOFLOW not to compound its violation by making public or exploiting any of the trade secrets taken from Insolette. And I want to … Those paragraphs cover beyond what the trade secrets taken by Insolette, and there's been no finding and no clarity as to whether or not that information constitutes a trade secret at all. Respectfully, I disagree, Judge Prost. And if I can take you to the text of the P.I. So the order specifically applies to these items relating to EOPATCH Version 2. So the passage that you were – your colloquy with my friend was about, but the – what EOFLOW is restrained from doing is relying on – or sorry, is marketing any product that was designed in whole or in part using our trade secrets. That's paragraph 1. Okay. Then the two definitional provisions, 3 and 4, trade secrets mean confidential information that was copied from Insolette by these named people or any other former employee. Confidential information means only things that were marked confidential by Insolette or CAD files, drawings, or specifications. Okay. That's the confidential information. All the stuff … No, it's not. As you said, C covers information that was not marked confidential, too. Sure. It's not marked confidential. That's because CAD files can't be marked confidential. They're three-dimensional. There's ample evidence in the record about why some of these computer files did not have a confidentiality marking but are nonetheless the most sensitive trade secrets. So the CAD files, drawings, or specifications. So then the rest of the order is aimed at making clear that a product that incorporates these things can't be sold and that – so 5A through G makes clear what the aspects of the product are. Now, there's a carve-out separately in paragraph 6 that says, okay, Insolette is not arguing that these aspects of the EO patch are derived from the trade secrets. So those are okay. So that's where – those are permissible to market. And the reason why I don't think … Counsel, the Court dealt very cursorily with two of the four factors that are necessary, the balance of the equities, five lines, fourth factor, public interest, little impact. These were clearly dealt with. So in a trade secret misappropriation case where the claim of the balance of the equities is just we'd like to go on exploiting the misappropriated invention, I think the district court correctly recognized that that is a very simple balance. He said it in two sentences. On the one hand, Insolette's facing irreparable injury. On the other, EOFLOW would like to continue benefiting from the misappropriation. That's a pretty straightforward balance of the equities. I don't think it needed longer. But what about if, in the meantime, EOFLOW has 1,000 employees. They're all going to lose their job. The company is going to go out of business. And on the public interest, all the folks in Korea that are relying on this life-saving medical information are going to suffer. The Court doesn't have to say that outweighs the harm to you, but doesn't the Court have to grapple with that? So that's all dealt with by the first modification, I think, because the Court gave a draft of the order to EOFLOW, allowed them to look at it. They didn't propose any changes. Then they came in with an emergency motion and said they wanted the following modifications. There's no further findings at that point, are there? About the public interest. I think the Court recognizes... Or the balance of harms. No, I think the Court plainly recognized that he was adjusting, the district judge plainly recognized he was adjusting the balance of harms by allowing EOFLOW to go on marketing in these jurisdictions. And at page 9880, that's where EOFLOW told the district court that it would be able to go on as a company with these modifications because these modifications would allow it to service its existing customers. Now, we can discuss whether the subsequent modification, which, based on Insolette's bad behavior, I'm sorry, on EOFLOW's bad behavior, changes the exceptions. But at the time this order was entered, the order that's on appeal, the public interest is dealt with by these exceptions that allows EOFLOW to go on marketing. How about you're asking us, I understand, to affirm this P.I. on grounds that the district court did not articulate itself. Your friend on the other side, I think, thinks we can't do that, I guess, under First Circuit law. Do you have any case law that says we can do that? So I think, A, I believe we've cited at least one decision in our brief, and then also in footnote 7 of our brief, I think the related point, that if what the court, if what this court perceives the district court to have done is not gotten it wrong but simply failed to make an adequate explanation, then what the First Circuit law says is that you don't, you're not bound to vacate an injunction that is serving an important purpose, preventing irreparable harm that would have to be relitigated. What the court can do is remand for a further explanation. That's a slightly different point. But you think you cited a case that says we can affirm on alternative grounds. I believe it's on page 37 of our brief. Well, what if our problem with the articulation includes irreparable harm? We're supposed to say we have real questions about whether or not there is irreparable harm, but in order to prevent irreparable harm, we're going to give them another chance? So I think that our two First Circuit cases in that footnote are going to go both ways. One of them says because the appellee is very, very likely to succeed on the merits, we need more explanation of irreparable harm, and we've remanded for that purpose. I know your time is running out, but I have one quick question on the process here, which is this question I was asking your friend about the judge's actions, and now he's given us kind of a time frame of June 1st or whatever it was. What if we do nothing by June 1st? Then his amended order goes into effect. It supersedes, at least in certain respects, the issues that are before us on appeal. What are we doing here? I disagree that it supersedes any of the issues that are on appeal, Your Honor. And if the Court were trying to do that and to change the categories of trade secrets at issue, that might be another matter. But I just disagree respectfully that the modification, which changes only the carve-outs that were sought by EOFLOW and granted to EOFLOW in the first modification, that that impacts any of the issues that are before this Court. We think they were with the – EOFLOW asked the district court for modification, and having come here and saying that the district court was without authority to grant that modification, I mean, on EOFLOW's view, the May 1st deadline would still be operative, at least the view that Mr. Gershenson took this morning. We don't think that that's correct. We think the district court had authority to modify the preliminary injunction because that is how the division of labor between district courts and courts of appeals work when an interlocutory P.I. appeal is going on. So the answer to your question, Judge Gross, is that on May 1st, unless the court – unless this court tells the – I'm sorry. On June 1st, unless this court tells the district court to do something else, that the modification of the injunction will take effect. At the risk of testing the patience of my colleagues, if you could just quickly answer. I've got just a couple of very quick questions. On Medtronic, on the second page, they say that they may still be interested, but as I'm sure you know, on the prior page, I think it's Mr. Kemp says, the acquisition agreement was terminated and it's been canceled. That – we can take that as correct. Can we know that? Respectfully, no, Your Honor. I mean, I think that the – like, given what the same person says on the same investor call a page later, that Medtronic is still interested. So I guess the question is, what did the CEO mean by canceled? But the same CEO, and this comes up in the contempt proceedings that we filed before the district court, the same CEO had said that they have plans B and C and D besides the Medtronic acquisition. So we certainly reject the premise, A, that Medtronic is definitively off, B, that it matters. Okay. Quickly, I think I heard you say that the jury is going to have to decide statute of limitations. Is that how you see this going? It is. So you don't think we could decide or order the district court to address as a matter of law whether or not the claim that you timely brought, your trade secrets claim? So at this stage, it's just likelihood of success. The district court is foreshadowing. And, again, this was based on just a few weeks of expedited discovery that finished up in early October. The district court was foreshadowing what the parties would be able to prove at trial. The ultimate question of statute of limitations is a defense. EOFLOW is going to assert it, and the jury will decide it. And EOFLOW will bear the burden on statute of limitations and proving on what date the claims accrued, just like any other limitations. On the public interest, you wrote that the strong public interest in protecting IP rights favors Insolet. District court didn't say that, did they? I agree the district court did not say that. And then just finally, the definition of trade secret in the order, it includes all information and materials that were marked confidential by Insolet. That's far broader than anything, than what courts have said is a trade secret. Isn't that correct? Paragraph 4A? But it has to be that was copied, downloaded, removed, or otherwise taken from Insolet by one of these people. So, in other words, it's about But if it, so if one of the four employees happens to have any document that, for whatever reason, someone at Insolet stamped confidential, the district court's saying that's a trade secret. No. Respectfully, Your Honor, the district court says that they're enjoined from exploiting it during this litigation. The reason for that is because the district court has found a likelihood of success on the eight categories. District court understands that those likely are not going to be the only categories. And if I may call your attention to paragraph 2 of the injunction order. Paragraph 2 says EOFLOW is enjoined from disclosing any further. Considering that EOFLOW has been putting our trade secrets into its own patent applications, this is an important provision so that the district court did not want to give the infringer the benefit of the doubt when information marked confidential is before it and they're deciding whether to exploit it. Thank you. Thank you, Mr. Perry. Thank you, Your Honor. Mr. Gershenson, take five minutes if you need it. Thank you, Your Honor. Just to address some of what we just heard about the plans B, C, and D, for example. Right. So Winter says, Spring, Precision, and Winter says possibility is not imminent harm. Right. That's, quote, too lenient. Right. So that's not enough. In terms of what I heard my colleague say that he admitted the order goes beyond. Right. It goes beyond any defined trade secrets, and it also goes beyond the relief that Inslet itself sought in the beginning, which was at 7839, and that's not in the printed appendix, so I'll point also to ECF 108 just for clarity for the record. It was specifically to prevent disclosure of Inslet's trade secrets to its largest competitor. Right. Medtronic. That's gone. That irreparable harm that we claimed, they asserted, they insisted, is gone. That the district court relied on entirely is gone. I think we also touched on the modification issue a little bit. Right. So there has been a substantial modification, and it's made the balance of harms much worse. We talked about insolvency, Judge Stark mentioned. Right. And that's under Virginia Carolina Tools, the Fourth Circuit case, also the REMAX case in DEMAS, and the Grease Monkey case. You can't kill a company with a preliminary injunction because then you never even get to the merits. And so as we speak, employees have been sent home. Manufacturing lines shut down. Patients losing choice. Right. They're losing their sole alternative to the disposable patch pump. And that's even happening in areas and jurisdictions where Inslet doesn't even operate. So there's no option. Right. And everyone agrees that their product and ours, the disposable patch pump, is the clinically superior, safer option. The Medtronic MiniMed case that we talked about in our briefs addressed a very similar scenario, and the injunction was denied. You know, lastly they mentioned, well, there's purloined documents. Just to be clear, this is not a case of a company hiring employees to take information. Those employees were, as the Court said, long gone before they ever came to EFLA. They left Inslet in 2010, 2010, and 2015. So, you know, that idea of retention is very different than what we're talking about here. And finally, you know, this, the whole reason for interlocutory appeal is not to decide that an injunction was wrong and improvidently granted and then let it stand. Right. That doesn't make sense. And that's what this Court held in Nutrition 21. That's what the First Circuit held in the Trustees of Boston College and in the Newcom Wireless case. So if they got it wrong, for example, if they got it wrong on likelihood of success, you vacate. If the issue wasn't analyzed, you vacate. If you try to support it on grounds that weren't dealt with in the district court, you vacate. And that makes perfect sense, and that's what we would ask for here. Before your time runs out, your friend referred to these eight categories. I don't know what the terminology is. Is it, yeah, those are at least a little more specific or clearer in terms of trade secrets. Do you have a view on that? We do. And so that was what I referenced with the expert, Mr. Sherman. And I should have the site for you momentarily. But essentially what Mr. Sherman did was he looked at every one of those trade secrets. I do know that it's in our reply brief at page 15 of the citation to the appendix. And he looked at every one of them. And he said this is generally known through Insulet's own patents, for example, in presentations. This is readily ascertainable. And they admit that you can reverse engineer it. You can look at it. You can see a cannula seal. You can see the roughness of a tube nut. You can see a silicon coating. You can see a reservoir running through a product. It's readily ascertainable. And third was the reasonable measures. And we know that they didn't take reasonable measures. They've got unsigned exit documents. They say these documents were part one. Please. Kagan. The district court dealt with some of those arguments. Maybe not all of them. So you're right. And what the district court didn't do as a strictly legal matter is look at any reasonable measures after misappropriation, as the pie versus pie Fifth Circuit case mandates, as Neural Magic indicates. I believe the AlphaPro case also. So the Alamar case. Excuse me. The Alamar case also deals with failure. Right? You've seen something. You're on notice. What do you do? Well, they didn't look at any access logs and find every document that was taken. They didn't reach out and say, here's a reminder of your obligations. They didn't request the documents back. They didn't even send a cease and desist to EOFLOW. So it doesn't seem like a reasonable measure, if you're not willing to take 90 minutes of work to send a letter, to then say you're a billion-dollar trade secret. Please. Balance of harms and the public interest. As Judge Lurie pointed out, the district court analysis seems pretty cursory on those two points. But then, as Mr. Jay pointed out, you had an opportunity to suggest changes to the original order, and then the district court seemed to have made some modifications. Can we not infer from that that there was a further balancing and understanding of potential harm to you and to the public? So let me address both pieces. First, we said we disagree in total with the entire piece, and we need to appeal it. That was the message to the district court. Second, we were allowed, quote, minor supplementation, as the judge said. And we said no big arguments. And, yeah, it was wordsmithing. And so we were managed. We did stave off the worst of the worst, briefly, right, in Korea. And the European Union, we were allowed to sell. And now we're not. And that's the whole problem. Okay. But in terms of trying to understand whether the district court considered harm to you and to the public, isn't it clear that he did, given that he accepted these modifications? I have no indication of that in the record, Your Honor. And certainly, if he did, he has withdrawn any such consideration. And so that's not available to us now. Thank you. Thank you all. Thank you. Both counsel, the case is submitted.